IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| In Re: Don Bryce Cozart, Debtor | No. 5:08-bk-73392 |
| | Ch. 7 |
| Sid Vinson and Mirela Vinson | Plaintiffs |
| vs.  Adv. Proc. No. 5:08-ap-07202 | |
| Don Bryce Cozart | Defendant |

**MEMORANDUM OPINION**

On December 19, 2008, the plaintiffs, Sid and Mirela Vinson [the Vinsons] filed a Complaint to Determine Dischargeability of Certain Debts against the defendant/debtor Don Bryce Cozart [Cozart]. The Vinsons are seeking a finding that Cozart's debt to the Vinsons is non-dischargeable and denying the debtor's discharge. The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court held a hearing on June 4, 2009, and gave the parties until July 6, 2009, to submit their closing arguments to the Court in writing. For the reasons stated below, the Court finds that a debt to the Vinsons in the amount of $232,256.00 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The Court denies the remaining requests for relief.

**Causes of Action**

The Vinsons allege that they have sustained damages as a result of Cozart's false pretenses, false representations, and/or actual fraud that induced the Vinsons (1) to purchase a materially defective home constructed by Cozart through his entity, Covington Custom Homes, LLC [Covington], and (2) to enter into a settlement agreement resolving claims relating to the construction of the home. Additionally, the Vinsons allege that these sustained damages were also incurred on account of a willful and malicious injury by Cozart to the Vinsons. As a result, the Vinsons claim that the sustained damages are non-dischargeable debts pursuant to § 523(a)(2)(A) and § 523(a)(6). The Vinsons also seek to deny Cozart from receiving a

discharge and allege (1) that Cozart unjustifiably concealed, destroyed, or otherwise disposed of certain records of his financial condition or business transactions under § 727(a)(3); and (2) that Cozart has failed to explain the loss of assets to meet his liabilities under § 727(a)(5).

**Background**

In November 2005, the Vinsons traveled to Fayetteville, Arkansas, to look for a home to purchase. They were unsuccessful in finding a home in November and returned in December to search again. Before the Vinsons returned, their real estate agent, Sue Calloway, found two homes that fit the Vinsons' requirements. Both homes were located in the Covington Park neighborhood and constructed by Covington/Cozart. The first day the Vinsons visited the homes, they formed a "favorable impression" of the house located at 2359 Covington Park Boulevard in Fayetteville, Arkansas, which was approximately sixty-five percent complete at that time. The Vinsons returned the next day to look at the house again. The Vinsons testified that on this second visit, they met Lisa Herring, the seller's agent, and Cozart, the seller. Ms. Vinson testified that Cozart represented himself as the builder of the homes in the Covington subdivision. She also stated that they had an extended conversation with Cozart about the house and Cozart's abilities and experiences as a builder and that he walked them through the house and other homes in the Covington subdivision. The substance of the conversation with Cozart constitutes an important basis of the Vinsons' fraud claim. Cozart testified that it was "not true" that he met with the Vinsons, and he claimed he did not walk the Vinsons through any homes. However, Cozart testified that he was sometimes present when prospective buyers visited and that he would walk them through the homes, though not by himself. The Court finds the Vinsons' testimony regarding meeting Cozart and their memory of the conversation detailed, credible, and consistent. While Cozart may not recall meeting with the Vinsons, the Court finds that the Vinsons' recollection is accurate.

According to Ms. Vinson, Cozart accompanied them through the house, explained how the house would be completed, showed them other houses in the subdivision, and discussed his experience as a builder. The Vinsons allege that during this conversation, Cozart made fraudulent representations and statements concerning (1) his experience as a builder and (2) the quality of

the construction of the house--including the quality of the subcontractors he hires and the material he uses--, and that these representations induced them to purchase the home.

Regarding Cozart's experience in construction, Ms. Vinson testified that Cozart said he was a "great builder," that he has "a lot of experience," that he has been in the construction business "for a while," and that he had built many local structures, including a shopping center, a convenience store, a road and bridge to a local school, and other homes in the Covington subdivision. Ms. Vinson testified that this listing of accomplishments was "really impressive," and she and Dr. Vinson looked at the other houses and local structures Cozart claimed to have constructed. Regarding the quality of construction of the house, Ms. Vinson testified that Cozart represented that he hired the best contractors and subcontractors, that he "doesn't spare money," that his job was "about making people happy and building the best house and he knows how to build it," and the Vinsons would have "the best house that money can buy." Ms. Vinson stated that she took Cozart's statements as statements of fact because Cozart backed up his statements with examples of his work and explanations of why he was a great builder, what constitutes quality construction, and descriptions of the construction process and final product.

Ms. Vinson testified that in making their decision to purchase the residence, the Vinsons relied upon these representations and statements. Ms. Vinson stated that the identity of the builder was an important consideration, and Dr. Vinson testified that he would not have purchased an unfinished house without having a conversation with the builder. Based on these conversations, it was Ms. Vinson's impression that the quality of the construction would be consistent with the price of the house per square foot. The Vinsons claim their reliance on Cozart's statements was reasonable because Cozart backed his statements with specific examples of his work that they were able to view and detailed descriptions of the construction process and final product.

Before the Vinsons left Arkansas, on December 28, 2005, the Vinsons entered into a real estate contract [Contract] to purchase the house and close in March 2006. However, the Vinsons chose not to get an inspection of the house because, according to their testimony, they did not think it was necessary--the house was brand new, it came with a one year warranty, and they believed

that Cozart would build them a "quality" house as promised. The Vinsons also did not visit the house again before closing in early March. Ms. Vinson testified that based on the representations by Cozart, they did not think it was necessary to review the construction process. When the Vinsons returned to close the transaction in early March, they did a final walkthrough with their agent and found mostly cosmetic errors that needed to be corrected. These cosmetic items were itemized on a "punch-list." The Vinsons were told that the punch-list items that were not corrected by closing would be fixed as soon as possible thereafter. The parties closed on March 9, 2006.

### Problems with the House

The Vinsons had several major problems with the house. The first problem occurred shortly after the Vinsons moved in when windows on the west side of the home leaked a large amount of water after a rainstorm. After notifying Cozart and Randy Shepard, Cozart's foreman, of the problem, Ms. Vinson was informed that the windows had not been caulked because they were supposed to be self-sealing. In the next few days, the windows were caulked. The next problem occurred in August 2006. Ms. Vinson noticed that the hardwood floors had buckled in the formal living room.[1] She informed Cozart and Shepard, who said that the buckling might have been caused when a pipe burst during plumbing tests around February 2006, which caused a leak in the wall between the formal living room and the office.[2] Ms. Vinson testified that this was the first time the burst pipe was disclosed.[3] She stated that if it had been disclosed, they probably would have hired an inspector to make sure the problem was remedied. During the repairs, the Vinsons discovered the floors in the office had also buckled and the subfloor was wet and somewhat moldy. Shepard brought in Mike Swain, a home inspector, and Swain and Cozart decided that the water had come from the burst pipe and had been there for a while. While the

---

[1] Ms. Vinson described the buckling as the edges of the floor being raised between each plank of hardwood and the floor appearing "wavy."

[2] Cozart testified that the plumbing company would have fixed that leak "very quickly" when it occurred.

[3] A seller's disclosure statement was not admitted into evidence.

4

floors were being fixed, the Vinsons noticed that the crown molding had cracked and some of the paint had curled. Ms. Vinson stated that Shepard told her the area had gotten wet because of another leak, unrelated to the burst pipe, that occurred while the house was being constructed. Shepard said that the jetted tub in the master bathroom had leaked and this created some flooding through the ceiling downstairs. This leak was also not disclosed to the Vinsons.

The next problem occurred in late August 2006, after another rainstorm. A recessed light in the downstairs family room was "leaking like a shower head." Ms. Vinson called Shepard who advised her to turn the lights off to avoid electrocution. Dr. Vinson called Cozart. Allegedly, Cozart told Dr. Vinson that the complaint was an exaggeration and that the problem could not be that bad. Cozart said that Becky Lynch, the interior decorator, would come look at the problem. By the time Lynch arrived, the ceiling was drooping. When the ceiling was cut out to remedy the problem, Ms. Vinson noticed that there was no insulation in the ceiling. To identify where the leak was coming from, Johnny Smith, an "expert" roofer, was brought in. Smith told the Vinsons that there was no flashing on the roof. Ms. Vinson stated that as a result of Smith's examination, flashing was installed, shingles and tiles were replaced, and the roof was cut open and allowed to dry. After about two weeks, no one had returned to finish repairing the roof. Ms. Vinson approached Cozart, who stated he thought the problems had been fixed. Cozart sent his crew to blow insulation into the ceiling and rebuild it.

In September 2006, the Vinsons noticed a ridge and unevenness where the new ceiling joined the original ceiling. She informed Cozart and Shepard of the problem. An employee of Cozart, Ricardo, told the Vinsons that the ceiling joists were uneven and that the "upstairs was too heavy for [the] downstairs," perhaps because of the jetted tub that came with the house. Additionally, after another rainstorm, a large wet spot appeared in the downstairs family room where the ceiling had leaked before. The Vinsons also had problems with drainage in the backyard. According to Dr. Vinson, Cozart told him that they would not have drainage problems because the backyard had a french drain. However, Dr. Vinson testified that after some rainfall, the backyard had standing water for months. Dr. Vinson claimed that he went to the backyard to search for the french drain, and found nothing. Ms. Vinson testified that while these problems

5

and repairs transpired, the small punch-list created at closing had not been satisfied.

At some point, the Vinsons contacted Cozart and told him that they needed to have a serious talk concerning the house because the Vinsons were unhappy about the necessity and quality of the repairs and worried about the possibility of mold growth in the house.[4] According to Ms. Vinson, Cozart said "his people" did not know what was wrong with the roof and he suggested that the Vinsons find another expert to examine the roof at Cozart's cost. The Vinsons hired Richard McDade. According to Ms. Vinson, McDade said that several areas were missing flashing or the flashing was installed improperly, and he found unsupported, cracking brick and crumbling mortar. Ms. Vinson testified that McDade said water was not only coming through the roof, but also through the brick and mortar. Dr. Vinson testified McDade estimated it would cost about $50,000.00 to repair the roof. Although Cozart agreed to pay for McDade's inspection, he would not agree to allow McDade to fix the roof.

McDade suggested that the Vinsons hire a moisture expert. The Vinsons hired Dave Brunell. Brunell found moisture in the walls of the house in areas where moisture had been previously discovered and in other areas. Ms. Vinson testified that Brunell said it was likely that mold was growing. The Vinsons presented Brunell's findings to Cozart and Shepard in November 2006. At this time, the Vinsons asked Cozart to buy the house back. Although his first response was no, Cozart eventually agreed. However, the Vinsons never heard from Cozart or his attorney; in February 2007, the Vinsons filed a lawsuit in the Circuit Court of Washington County [Circuit Court] for recission, breach of implied warranty of habitability, and negligence. (Def.'s Ex. 5.)[5]

James Gore, a licensed professional engineer in Arkansas, testified at this Court's June 4 trial. He had conducted a visual inspection of the interior and exterior of the home and prepared a report dated July 19, 2007. Gore stated that he found basic defects in the construction of the

---

[4] The mold growth was of particular concern to the Vinsons because one of their minor children had asthma.

[5] The complaint in evidence was filed against Don Cozart and Cozart & Co., Inc.

Vinsons' residence including, but not limited to, improperly attached brick veneer, inadequate or improperly installed brick ties, inadequate mortar,[6] a lack of flashing on windows and doors, and inadequate wood framing. Gore estimated a preliminary repair cost would be $182,256.00, that these repairs are reasonable and necessary, and that the estimate did not include roofing or mold remediation. The house had passed the city of Fayetteville's inspection performed on March 2, 2006. However, Gore testified that the defects he uncovered were code violations[7] and basic defects that any quality builder would know how to remediate.

Cozart stated that he did not advise the Vinsons against having the home inspected and admitted that the Vinsons had problems with the house that he sincerely regretted. He also testified that while he hopes the punch-list was taken care of, he was not certain. Cozart stated that he did not recall the Vinsons ever claiming to him that he defrauded them; however, it was clear to him that they did not think they got the house they wanted.

### The Settlement Agreement

On August 13, 2007, two days before the trial in Circuit Court, the Vinsons and Covington entered into a settlement agreement in which Covington agreed to purchase the Vinsons' house by April 30, 2008, and Cozart personally guaranteed Covington's performance. (Pls.' Ex. 2.) Pursuant to the settlement agreement, Covington had the right to, but was not required to, fix the house and/or attempt to sell the house; Covington/Cozart did neither. When Covington/Cozart did not purchase the house by April 30, 2008, the Vinsons filed a lawsuit to enforce the settlement agreement. On August 12, 2008, the Circuit Court entered a partial summary judgment order finding that Cozart failed to perform the terms and conditions of the settlement agreement and awarded the Vinsons a judgment. On August 26, 2008, before the Vinsons could enforce the settlement agreement, Cozart filed his bankruptcy petition.

---

[6] Gore testified that he was able to take a key or a knife blade (he could not recall which one) and poke holes in the mortar.

[7] Gore was referring to the 2002 Arkansas Fire Prevention Code.

7

Cozart testified that he had intended to purchase the house. However, he also testified that because the sale of certain real property did not timely occur and the sales of Covington homes decreased, he was not able to fulfill the terms of the settlement agreement. Cozart owned a forty percent interest in real property on which a convenience store [C-Store] was located. Cozart planned to sell the C-Store and use the proceeds to obtain a loan that would have allowed him to purchase the Vinsons' house.[8] According to testimony, an entity had been trying to buy the C-Store for a couple of years to develop it into a Walgreens; however, negotiations with this entity ended. Gary Combs showed interest in the C-Store in early 2008. Negotiations with Combs were ongoing, and Combs did eventually purchase the C-Store. A final contract for the sale of the C-Store was executed September 10, 2008, for $2,500,000.00, and the sale closed on October 21, 2008, approximately six months after Cozart was required to purchase the Vinsons' home. Meanwhile, the market decline decreased home sales in the Covington subdivision. Cozart testified that he did not sell a single house between February 2007 and February 2008. However, the Vinsons pointed out that between February and July 2008, Cozart was able to sell three houses after entering into this settlement agreement, two of which were in the price range of the Vinsons' house.

**Findings of Facts and Conclusions of Law**

    **False Representation, False Pretenses, or Actual Fraud**
    **Under 11 U.S.C. § 523(a)(2)(A)**

To prevail under § 523(a)(2)(A) on a claim of false representation, the Vinsons must prove by a preponderance of the evidence:

> (1) that the debtor made a representation; (2) that at the time the debtor knew that the representation was false; (3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representation; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the

---

[8] Andrew Cozart testified that, after paying corporate debts, the equity security holders would have received between $380,000.00-$400,000.00. Therefore, Cozart's forty percent share would have netted him approximately $152,000.00-$160,000.00.

8

representation having been made.

*Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999)(citing *Thul v. Ophaug* (*In re Ophaug*), 827 F.2d 340, 342-43 (8th Cir. 1987)).

### Purchase of the House

Both Ms. and Dr. Vinson testified that Cozart made several representations regarding his knowledge and experience as a builder, the quality of the house being constructed, and the type of subcontractors he employs. As stated above, the Court finds the Vinsons testimony in this regard detailed, consistent, and credible. Therefore, the first element of the false representation claim is satisfied.

To satisfy the second element, the Vinsons must show that Cozart knew the representations that he made were false at the time he made them. At the time Cozart made the representations, the house was sixty-five percent complete; Ms. Vinson testified that some brick was in place, though Cozart testified that most of the brick was in place. Because of the basic defects in the house that subsequently surfaced, it is clear that Cozart's representations as to the quality of himself as a builder, the quality of the construction, and the quality of the subcontractors he employed cannot all be true. While no house is perfect, the Vinson home was fundamentally flawed and suffered major water damage on multiple occasions that Cozart's "people" were unable to fix. If Cozart was a quality builder, he would have at least been aware of the subcontractors' most fundamental mistakes; conversely, if Cozart used quality subcontractors, they would not have made such basic mistakes. A quality builder using quality materials and subcontractors would not have produced a house with the basic problems to which Gore testified, the problems with water damage to which the Vinsons testified, or failed to make the repairs satisfactorily. Because the deficiencies are inconsistent with the representations made by Cozart, the Court finds that the representations were false at the time he made them; however, to satisfy the second element, Cozart must have known they were false. In determining Cozart's knowledge of the falsities, "the Court must consider the knowledge and experience of the debtor." *Moen*, 238 B.R. at 791 (quoting *Federal Trade Comm'n v. Duggan* (*In re Duggan*), 169 B.R. 318, 324 (Bankr.

9

E.D. N.Y. 1994)). While Cozart could not have known in December 2005 whether the finished product would be the best house money could buy, he was aware of the limits of his experience, his ability to identify quality construction, and his knowledge concerning the abilities of his foreman and subcontractors.

When Cozart purchased the land for the Covington subdivision, he only intended to develop the infrastructure. Cozart decided to build homes after he had sold a substantial number of lots because it "seemed like a good thing to do." Cozart testified to his construction process. Becky Lynch picked out certified house plans over the internet, which Cozart purchased for about $1100.00 each. A survey company matched the plans to the lot, and Cozart hired a foreman and subcontractors to build the homes from the plans. The first couple of homes were built by Bob Schmidt, who was with an entity called Hometown Development. According to Cozart, Schmidt was hired on a cost-plus basis and used "John somebody" as his foreman. At this time, Cozart's job was to pay the bills. Schmidt did not finish the two houses before he and Cozart parted ways over discrepancies in "the numbers." Cozart formed Covington Custom Homes, LLC, and continued to build the homes. Covington Custom Homes never had any employees. Cozart continued to build the homes using the subcontractors already in place that were affiliated with Hometown Development. When hiring new subcontractors, Cozart said he solicited bids but tried to stick with the subcontractors that were "good" as much as possible. Cozart hired Doug Baker as his foreman to take over the project on a contract basis. Cozart had known Baker for a "few years," and Baker had built a "really nice pool house" and a gazebo for Cozart. Baker left in January or February 2006, before the trim work was placed on the Vinsons' house. Cozart then chose Randy Shepard, a painting contractor for Cozart, as the foreman. When questioned about his choice of a painting contractor as his foreman, Cozart responded, "we are not talking about rocket science here. We are talking about coordinating qualified, certified subcontractors that get the proper permits, have the proper inspections, follow the codes."

Cozart's experience in residential construction is basically limited to hiring subcontractors and foremen and "supervising" their work. Cozart does not physically participate in any of the construction in a "hands-on" manner, but he testified that he considers himself a "good builder."

Cozart built the homes through his entity, Covington Custom Homes, while another entity, Cozart & Co. holds the residential building permit. Cozart relies on his subcontractors and foreman to construct "quality" structures. During the course of construction of the Vinson home, Cozart testified that he was at the Vinsons' home ten to fifteen times a week to monitor the construction. However, it was clear from his testimony that supervising and monitoring consisted of watching for an end result instead of ensuring that the work was quality.

"A false representation made under circumstances where a debtor should have known of the falsity is one made with *reckless disregard for the truth*, and this satisfies the knowledge requirement." *Moen*, 238 B.R. at 791 (quoting *Federal Trade Comm'n v. Duggan* (*In re Duggan*), 169 B.R. 318, 324 (Bankr. E.D. N.Y. 1994) (emphasis added)). Based on his experience, Cozart displayed a reckless disregard for the truth when he told the Vinsons that he was a quality builder, that the construction resulted in a quality house, and that he hired the best subcontractors. Cozart knew the limits of his experience and the effort and knowledge he applied to his role in the construction process. His statements to the Vinsons represented that he had an understanding of the fundamentals of construction and that he had the capability and knowledge as an experienced builder to say with certainty that the home under construction was quality.[9] However, Cozart misrepresented the extent of his experience and knowledge. While he may have "built" the other local structures through his entities, he had little fundamental understanding of construction or ability to identify a quality structure. Cozart's role was to pay the bills, watch the subcontractors perform their jobs, and look for an end result. He lacked substantive and technical knowledge about the construction process.

Cozart testified that he *knew* the subcontractors did their job correctly and built the houses according to the plans because he and his foreman "checked the subcontractors' work against the plans everyday." Even if Cozart checked his subcontractor's work, Cozart's knowledge about

---

[9] Cozart's tendency to disregard the truth was displayed at the hearing when Cozart asserted that, despite the defects, the Vinsons' home is a "quality home." Cozart cannot possibly believe that statement. Such a statement is so inconsistent with the testimony at the June 4 trial, that to continue to assert the home is "quality" reflects poorly on Cozart's credibility.

11

the caliber of house he was constructing was limited.[10]  With minimal substantive knowledge about construction, Cozart could not have known that he hired quality workers or whether the subcontractors were performing adequately.  Cozart knew that what they were building appeared to be a standing, aesthetically pleasing house but knew relatively little with regard to the structural integrity of the house.  If Cozart was hiring the best subcontractors, a quality subcontractor would have caught such basic defects as missing brick ties and improperly mixed mortar.  Based on his knowledge and experience, Cozart had no factual basis to assert that he hired the best contractors, that he was a quality home builder, or that he was building a quality house.  Because a reckless disregard for the truth is sufficient to satisfy the knowledge requirement, the second element has been met.

To satisfy the third element, the Vinsons must show that Cozart made the representations deliberately and intentionally with the intention and purpose of deceiving the creditor.  "The intent element of § 523(a)(2)(A) does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question."  *Moen*, 238 B.R. at 791 (quoting *Moodie-Yannotti v. Swan* (*In re Swan*), 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)).  "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act."  *Id*. (quoting *Duggan*, 169 B.R. at 324).  While the Court does not find that Cozart was motivated to make the false representations out of malevolence or personal ill-will, the statements were made with the intent to induce the Vinsons to purchase the home.  Cozart testified that when he showed prospective purchasers his homes, he did so with the intent to show them what he had for sale.  However, in making the representations to the Vinsons, prospective buyers who had formed a "favorable impression" of the home, Cozart

---

[10] For instance, Cozart claimed he supervised the bricklayers, but admitted he did not know what the proper mixture was for the brick and mortar.  He admitted that he does not know how to "weld or hammer a nail," and claimed he did not have to because he sold more houses than others with more "technical" knowledge.  The Court agrees that Cozart is a good salesperson and businessperson, but he does not have the substantive knowledge about construction to make the representations that he made to the Vinsons.

should have known that his statements would induce the Vinsons to rely on those statements in deciding to purchase the home. Therefore, the third element is satisfied.

The fourth element is that the creditor justifiably relied on such representation. According to the testimony, the Vinsons decided to purchase the house after seeing the house twice, an extended conversation with Cozart, and looking at Cozart's other structures. The Vinsons testified that they relied on Cozart's statements in deciding to purchase the home. Statements made by a seller in this context are normally considered "mere puffery," and as such, cannot be reasonably relied upon. *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 762 (Bankr. E.D. Tenn. 2003). However, Cozart's statements went beyond puffery. Cozart's statements were more akin to the oral presentation of a resume than vague, opinion-like statements within the ambit of puffery.

> [W]hen a proposed seller goes beyond [mere exaggeration of the qualities which an article has], assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has but invents advantages and falsely asserts their existence, he transcends the limits of 'puffing' and engages in false representations and pretenses.

*Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004)(quoting *United States v. New South Farm & Home Co.*, 241 U.S. 64, 71 (1916)). Cozart assigned attributes to the house and himself that neither had. He said that the house was quality and that he was a quality builder, when, in fact, the house lacked basic structural attributes a quality builder would have detected. Cozart stated that he hired the best subcontractors, when it appears he lacked the knowledge to discern whether a subcontractor was actually performing good work.

Cozart also promised that the home would be the best home money could buy. Generally, a promise of future results "cannot be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made." *Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir. 1979). However, courts have found exceptions to this rule when a "false prediction concerning future events made by one with superior knowledge of those events may constitute a fraudulent misrepresentation." *Id.* (citing cases); *Sadovsky v. Hassler*, No. 95-50885, 1996 WL 762848, at *6 (5th Cir. Dec. 16, 1996)(finding that prospective purchasers relied on the seller's "experience and knowledge as a professional jeweler . . . taking his statements beyond the ambit

of mere puffery" where his "statements conveyed the definite impression that [a] necklace was of extremely high quality."). The Vinsons took Cozart at his word, believed that he was an experienced and knowledgable builder--not just a general supervisor of builders looking for an end result--and, therefore, relied upon his statements. Cozart's experience and knowledge was merely supervisory; while this is an important skill, it is different from the type of knowledge he represented he possessed.

The difference between puffery and a fraudulent statement is that "in the latter situation, the recipient of false information is in a position to reasonably rely on the assurances of the speaker." *Operation King's Dream v. Connerly*, 501 F.3d 584, 589 (6th Cir. 2007)(citing *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853 (2d Cir. 1918)). This was the Vinsons' first experience buying a home and there was no testimony that either had any business, legal, or construction experience. Taken together, the representations of Cozart were sufficiently convincing to the Vinsons that they were comfortable in foregoing an independent inspection. The Vinsons relied on Cozart's asserted knowledge and experience and were justified in doing so based on Cozart's efforts to prove the veracity of these statements. Cozart showed the Vinsons how the house would be completed, showed them completed houses in the subdivision, and described his abilities and experience. Given the totality of the facts before the Court, the Court finds that the Vinsons' reliance on Cozart's representations was justifiable.

To meet the final element, the Vinsons must have sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. Because Cozart made the false representations to the Vinsons, the Vinsons purchased a home in need of $50,000.00 in roof repairs, according to the testimony of Dr. Vinson, and additional repairs in the amount of $182,256.00, according to the testimony of Gore. Although there was testimony of the need for mold remediation work, the Vinsons provided no evidence as to the amount of damages as a result of the mold remediation. However, the testimony by Dr. Vinson and Gore is sufficient to satisfy the fifth element. Because the fifth element of § 523(a)(2)(A) has been met, the Court finds that $232,256.00 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and the

Vinsons are entitled to a judgment against Cozart in that amount.[11]

### Settlement Agreement

While Cozart made the representation in the settlement agreement that he would purchase the house from the Vinsons by April 30, 2008, the Vinsons did not meet their burden to satisfy the remaining elements of false representations or prove a claim of false pretenses or actual fraud with respect to the settlement agreement. To prevail, the Vinsons must show that Cozart entered into the settlement agreement with the knowledge that he would not be able to uphold the terms of the agreement--that he falsely represented to the Vinsons that he would buy back their house knowing that he would not be able to honor this obligation at the time he executed the settlement agreement. While Cozart may not have prioritized the sale of the Vinsons home over the sale of other homes in the Covington subdivision, the Court finds that Cozart did intend to purchase the home at the time he entered into the settlement agreement. Cozart was in ongoing negotiations to sell the C-Store, which would have netted him enough money to obtain a loan to purchase the house. Cozart introduced a Memorandum of Understanding that supports this explanation. The memorandum states that the purchaser of the C-Store would "assist Cozart in obtaining $90,000.00 by Tuesday August 26, 2008, for the purpose of puchasing a home in Covington Park (Lot 122)." (Def.'s Ex. 8.) Lot 122 is the Vinson home. (Pls.' Ex. 2.) The memorandum is not signed by Cozart; however, it is signed by Gary Combs and reinforces Cozart's reliance on the sale of the C-Store to fulfill his obligation under the settlement agreement.

Although Cozart never attempted to repair or show the Vinsons' house after he entered into the

---

[11] Cozart's conduct described above also satisfies a claim of false pretenses. False pretenses involves an "implied misrepresentation or conduct intended to create and foster a false impression." *Moen*, 238 B.R. at 791(quoting *Leeb v. Guy* (*In re Guy*), 101 B.R. 961, 978 (Bankr. N.D. Ind.1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression." *Id*. (quoting *Trizna & Lepri v. Malcolm* (*In re Malcolm*), 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). Again, Cozart alone knew the limits of his knowledge as a builder, yet his statements, examples, and explanations led the Vinsons justifiably to believe that he was far more experienced and knowledgeable about construction than he was. Cozart's statements were inaccurate, misleading, and induced the Vinsons to purchase a materially defective home.

settlement agreement, he did have a plan that he believed would work. The agreement did not require Cozart to try to sell or repair the home, Cozart merely had the option. Cozart was required to do two things relevant to this Court's inquiry under the terms of the agreement--buy the house back by April 30 or become personally liable on the debt. The Vinsons bargained for this consideration. Cozart chose to rely on the sale of the C-Store to net him enough money to meet his obligation and knew that the consequence of breaching the agreement was personal liability on the debt. Perhaps it was not wise to rely on the sale of the C-Store entirely, but it was not fraudulent. Further, Cozart's decision to become personally liable under the settlement agreement is additional evidence that Cozart intended to fulfill his obligation. Accordingly, the Court denies the Vinsons' complaint to determine dischargeability under § 523(a)(2)(A) based upon the settlement agreement.

### Willful and Malicious Injury Pursuant to 11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that a debtor cannot discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The debt must be for both a willful injury *and* a malicious injury. *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir. 2008). In order to find that a willful injury occurred, there must be a deliberate or intentional injury, not merely a deliberate or intentional act that caused an injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). If the debtor knows "that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences." *Patch*, 526 F.3d at 1180 (citing *Geiger v. Kawaauhau* (*In re Geiger*), 113 F.3d 848, 852 (8th Cir. 1997)(en banc)). In order to find that a malicious injury occured, the conduct in question must have been "*targeted* at the creditor . . . , at least in the sense that the conduct is certain or almost certain to cause financial harm.""*Barclays Am./Bus. Credit v. Long* (*In re Long*), 774 F.2d 875, 881 (8th Cir. 1985)(emphasis added).

The Vinsons allege two injuries in this case. The first injury stems from the Vinsons purchasing a house with many defects; the second injury results from Cozart's failure to fulfill the terms of

16

the settlement agreement. The Court finds that the injury resulting from the purchase of the house was not on account of willful or malicious injury. Cozart's reckless disregard for the truth does not rise to the level of conduct required in § 523(a)(6). Section 523(a)(6) requires an intentional tort involving willful and malicious conduct. *Kawaauhau*, 523 U.S. at 61-62 (finding that intentional torts generally require that the actor intend "the consequences of an act"); *Long*, 774 F.2d at 881 (finding that malicious conduct contemplates "a heightened level of culpability . . . [that goes] beyond recklessness"). Although Cozart acted with a reckless disregard for the truth regarding his experience, his knowledge concerning the quality of the home, and of his subcontractors, the Court does not find that Cozart intended to cause any prospective purchaser harm. Cozart repeatedly attempted to repair the house to bring it up to the standards he initially promised the Vinsons. Both Cozart and Herring testified that Cozart's goal was to make the Vinsons happy, and the Court believes that Cozart was hoping that he could.

The Court also finds that the second injury, which resulted from Cozart dishonoring his obligation under the settlement agreement, was not on account of a willful or malicious injury. As discussed above, Cozart intended to honor his obligation under the settlement agreement when he entered into it. "[A] simple breach of contract is not the type of injury addressed by § 523(a)(6)." *Snoke v. Riso* (*In re Riso*), 978 F.2d 1151, 1154 (9th Cir. 1992). Cozart did not intend to harm the Vinsons by entering into the settlement agreement; rather, he intended to buy their house back utilizing the C-Store sale proceeds and negotiations to do so remained ongoing. Therefore, the Vinsons' claim under § 523(a)(6) must fail. Cozart did not intend to willfully or maliciously harm the Vinsons when he falsely represented the extent of his experience and his knowledge concerning the quality of the home and his subcontractors. Cozart also did not intend to willfully or maliciously harm the Vinsons by entering into the settlement agreement. Accordingly, the Court denies the relief requested pursuant to § 523(a)(6).

### Denial of Discharge Under §§ 727(a)(3) and (5)

Section § 727(a)(3) denies a debtor a discharge if the debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." Section § 727(a)(5) denies the debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Although the Vinsons questioned Cozart's business practices, the Vinsons did not point to any specific business records or writings that they alleged Cozart concealed, destroyed, or failed to keep. Therefore, the Vinsons' § 727(a)(3) claim is denied.

Regarding their § 727(a)(5) claim, the Vinsons' counsel elicited testimony and introduced evidence regarding post-petition changes in Cozart's income and expenses, undisclosed uncashed checks, and an unscheduled claim. At the time Cozart filed his bankruptcy schedules, he received monthly income in the amount of $8016.67 and had expenses in the amount of $10,538.30. Prior to filing his bankruptcy petition, Cozart had drawn a salary from Rogers Door Company, Inc., which entity includes Fayetteville Door Company, and Fort Smith Door Company [Door Companies]. Cozart is president of the Door Companies.

At some point after he filed his petition, Cozart stopped drawing his salary, but did not stop working at the Door Companies performing sales work. Cozart explained that he stopped drawing his salary because he did not need a salary--the Door Companies paid for his gas and rent, and his social security check paid for his food. MaryJane Cozart, Cozart's ex-wife, stated in her deposition taken May 27, 2009, that Cozart stopped drawing his salary because "he's in bankruptcy . . . and if he has a salary, I think the money goes to the bankruptcy judge." (Pls.' Ex. 3 p. 24-25.) However, she later stated in the same deposition that he stopped receiving a salary because the Door Companies could not afford it. It is unclear exactly when Cozart stopped receiving his salary. Mary Jane Cozart stated in her deposition that he stopped receiving a salary in "[2007] sometime, as far as I know. Because he had a stack of checks he never cashed and . . . [.]" (Pls.' Ex. 3 p. 26-27.) However, at the hearing, Cozart testified that his schedules, which reflected that he was drawing an income from the Door Companies, were correct at the time of filing but that he presently does not draw a salary from the Door Companies. Cozart's expenses have also changed since he filed his petition. He explained that

two pieces of real property are in foreclosure, and, as stated above, the Door Companies are paying for his rent and utilities.

If the creditor demonstrates a deficiency of assets, the burden shifts to the debtor to explain the loss. *Eggert v. Sendecky* (*In re Sendecky*), 283 B.R. 760, 766 (B.A.P. 8th Cir. 2002). The Vinsons argue that the deficient asset is Cozart's income from the Door Companies. However, Cozart testified that his schedules were correct at the time he filed his petition, and the Vinsons did not rebut this assertion to the satisfaction of the Court. Mary Jane Cozart's statement that he stopped receiving a salary sometime in 2007 was indefinite. Any salary Cozart would have received on account of post-petition work would have been post-petition income and not property of his chapter 7 bankruptcy estate, and, therefore, available to creditors at Cozart's volition. 11 U.S.C. § 541. Further, even if the Vinsons had shown that Cozart stopped receiving his salary pre-petition, Cozart and his ex-wife stated that one reason he stopped receiving his salary was because the Door Companies could not afford to pay him.

Additionally, Mary Jane Cozart's reference to a stack of uncashed checks is not enough to deny Cozart a discharge under § 727(a). The reference to the stack of uncashed checks was not elaborated on in sufficient detail to prove "facts establishing that a loss or shrinkage of [Cozart's] assets actually occurred." *Sendecky*, 283 B.R. at 765. Cozart also asserted he has a $100,000.00 claim against McDonald's as the result of a property transaction that took place around 1998. Cozart explained that he did not list this as an asset because the statute of limitations on the cause of action had passed. There was little testimony regarding the nature of the alleged claim and the vague testimony raises questions as to the claim's existence at all. Further, Cozart testified that the money would have been owed to an entity called Cozart Development. To the extent the claim is an asset of the estate, the Court is satisfied with Cozart's explanation as to why he did not list the claim. Therefore, because the Vinsons did not meet their burden of proof under § 727(a)(5) regarding changes in Cozart's income and expenses, a reference to uncashed checks, and Cozart's alleged claim against McDonald's, the § 727(a)(5) claim is also denied.

19

**Conclusion**

For the reasons stated above, the Court finds that a debt to the Vinsons in the amount of $232,256.00 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(a). The Court denies the request for relief pursuant to § 523(a)(6) because Cozart's conduct did not rise to the level of willful or malicious as contemplated by the statute. Further, the Court denies the Vinsons' request that Cozart's discharge be denied. The Vinsons did not meet their burden to show that Cozart unjustifiably concealed, destroyed, or otherwise disposed of certain records of his financial condition or business transactions as stated in § 727(a)(3), or that Cozart has failed to explain the loss of assets to meet his liabilities under § 727(a)(5). The Court will enter a separate judgment in favor of the plaintiffs, Sid Vinson and Mirela Vinson, and against the debtor, Don Bryce Cozart, in the amount of $232,256.00.

IT IS SO ORDERED.

"

| September 11, 2009 | Ben Barry |
|---|---|
| DATE | BEN T. BARRY |
| EOD 9/11/2009 by R Johnson | UNITED STATES BANKRUPTCY JUDGE |

cc:   Donald E. Wilson, attorney for the plaintiffs
      Stanley V. Bond, attorney for the debtor
      John T. Lee, chapter 7 trustee
      U.S. Trustee

20